# IN THE SUPREME COURT OF TEXAS

════════════

No. 19-0777

════════════

IN RE CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC, RELATOR

════════════════════════════

ON PETITION FOR WRIT OF MANDAMUS

════════════════════════════

**Argued October 8, 2020**

JUSTICE BUSBY announced the Court's disposition and delivered an opinion, in which JUSTICE LEHRMANN, JUSTICE DEVINE, and JUSTICE BLAND joined.

JUSTICE BOYD filed a concurring opinion.

CHIEF JUSTICE HECHT filed a dissenting opinion, in which JUSTICE BLACKLOCK joined.

JUSTICE HUDDLE did not participate in the decision.

Three cases we decide this term address whether the exclusive jurisdiction of the Texas Public Utility Commission (PUC) over an electric utility's rates, operations, and services extends to certain issues raised in common-law tort suits against utilities.[1]  In this case, a good Samaritan was electrocuted while attempting to help the victims of a wreck that downed a CenterPoint power line, and his estate and family sued CenterPoint for negligence.  CenterPoint's plea to the jurisdiction presents the following question: does the PUC have exclusive jurisdiction to adjudicate issues of duty and breach that underlie these plaintiffs' claims?

---

[1] *See also In re Oncor Elec. Delivery Co.*, __ S.W.3d __, __ (Tex. June 25, 2021) (No. 19-0662); *In re Tex.-N.M. Power Co.*, __ S.W.3d __, __ (Tex. June 25, 2021) (No. 19-0656).

We hold that the PUC does not have exclusive jurisdiction because the plaintiffs and their decedent are not "affected persons" statutorily authorized to bring a complaint in the PUC. In addition, whether a regulatory scheme has displaced the common-law duty of reasonable care is a matter for courts—not agencies—to decide, and CenterPoint correctly argued in the trial court that the common-law standard applies. It is for a trier of fact to determine whether the utility breached that standard, as the PUC itself has long acknowledged. The trial court therefore did not abuse its discretion by denying CenterPoint's plea to the jurisdiction, and we deny its petition for writ of mandamus.

## BACKGROUND

Two vehicles were involved in a collision in southern Harris County after the driver of one vehicle ran a red light. The vehicle that ran the light hit a wooden utility pole, causing the pole and the power line attached to it—owned and maintained by CenterPoint Energy Houston Electric, LLC—to fall to the ground. Glenn Wood Higgins was driving near the wreck and stopped to render aid. While walking toward the vehicle, plaintiffs allege that Higgins came into contact with electricity radiating through the ground from the downed power line. The contact knocked his body onto the line, shocking him and catching his clothes on fire. Higgins suffered severe burns and passed away three weeks later.

Higgins's family members[2] and estate (collectively, plaintiffs) brought wrongful-death and survival claims against CenterPoint in Harris County Probate Court. Plaintiffs asserted

_____

[2] The individual plaintiffs are Karen Y. Higgins, Megan Higgins, Tommy Higgins, and Maxwell Higgins.

causes of action for common-law negligence and gross negligence.[3]   They alleged that CenterPoint has a duty to design, construct, operate, and maintain its electricity distribution system to de-energize portions of the distribution lines promptly when they experience faults. Plaintiffs asserted that CenterPoint's line protection scheme was not prudently designed, and that CenterPoint chose and installed an inappropriately sized fuse.   Fuses are placed on power lines to stop the flow of electricity and de-energize the line in the event of a fault.  Plaintiffs contended that an appropriate fuse would have de-energized the downed power line in five seconds or less—before Higgins had even exited his truck.

CenterPoint filed a plea to the jurisdiction, contending that the PUC's exclusive jurisdiction over an electric utility's rates, operations, and services extends to adjudicating whether CenterPoint's line-protection measures complied with the law and industry standards. In CenterPoint's view, plaintiffs' complaints regarding fuse size implicate fundamental policy questions about how electric utilities must design, install, operate, and maintain their electric distribution systems.   In response, plaintiffs asserted that (1) the Texas Estates Code gave the probate court exclusive jurisdiction to adjudicate the case, (2) the Utilities Code provisions conferring jurisdiction on the PUC did not apply because plaintiffs were not customers of the utility, and (3) the electrical operations and services at issue did not fall within the PUC's exclusive jurisdiction because it has not regulated line protection systems but rather leaves it up to utilities to comply with the industry standard of care.

---

[3] Plaintiffs also asserted a claim for negligence per se but later nonsuited that claim.

The probate court denied CenterPoint's plea to the jurisdiction but stayed further proceedings while CenterPoint sought mandamus relief. CenterPoint filed a petition for writ of mandamus in the court of appeals, which denied relief without a substantive opinion.

ANALYSIS

CenterPoint asserts that the Public Utility Regulatory Act (PURA) gives the PUC exclusive jurisdiction to adjudicate the standard of care applicable to plaintiffs' tort suit and whether it violated that standard. Under the Texas Constitution, district court jurisdiction "consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where [such] jurisdiction may be conferred . . . on some other court, tribunal, or administrative body." TEX. CONST. art. V, § 8. As courts of general jurisdiction, district courts are presumed to have subject-matter jurisdiction over a dispute absent a showing to the contrary. *In re Entergy Corp.*, 142 S.W.3d 316, 322 (Tex. 2004). The Legislature may "bestow exclusive jurisdiction on administrative bodies," *Cameron Appraisal Dist. v. Rourk*, 194 S.W.3d 501, 502 (Tex. 2006), but those bodies may exercise only powers conferred in clear and express statutory language. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 220 (Tex. 2002). They do not share the jurisdictional presumption of district courts. *In re Entergy Corp.*, 142 S.W.3d at 322.[4]

When the Legislature has granted an agency exclusive jurisdiction to adjudicate a disputed issue, the agency has the sole authority to make an initial determination regarding that

---

[4] As explained below, the trial court here was a probate court, but it had exclusive original jurisdiction over this case by statute. Thus, the trial court was the appropriate authority to decide the plea to the jurisdiction CenterPoint filed, just as the trial court decided a plea to the jurisdiction in *In re Oncor Electric Delivery Co.*, __ S.W.3d at __, and a motion to dismiss for want of subject-matter jurisdiction in *In re Texas-New Mexico Power Co.*, __ S.W.3d at __. No provision in PURA, or any other law, empowers the PUC to decide the threshold question whether the presumption of trial court jurisdiction has been overcome.

4

issue, and a trial court lacks jurisdiction until a party has exhausted administrative remedies. *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 138 (Tex. 2018). Whether the PUC has exclusive jurisdiction over an issue is a question of statutory interpretation that we review de novo. *Id.* If the PUC has exclusive jurisdiction, mandamus is an appropriate remedy to correct a trial court's denial of a plea to the jurisdiction. *In re Sw. Bell Tel. Co., L.P.*, 235 S.W.3d 619, 624 (Tex. 2007).

## I. The probate court does not have exclusive jurisdiction to adjudicate plaintiffs' wrongful-death and survival claims.

We first address plaintiffs' contention that because the Estates Code grants the probate court original and exclusive jurisdiction over this case, jurisdiction cannot be exercised by the PUC. Plaintiffs point out that Article V Section 8 of the Texas Constitution does not mention probate courts, which have original and exclusive jurisdiction under the Estates Code to adjudicate wrongful-death and survival actions. CenterPoint counters that the statutory probate court has concurrent—not exclusive—jurisdiction over plaintiffs' case, and that probate courts—like district courts—must defer to exclusive agency jurisdiction when applicable. We agree with CenterPoint.

A statutory probate court has jurisdiction only as provided by statute. TEX. CONST. art. V, § 1 ("The Legislature may establish such other courts as it may deem necessary and prescribe the jurisdiction and organization thereof, and may conform the jurisdiction of the district and other inferior courts thereto."); *Mobil Oil Corp. v. Shores*, 128 S.W.3d 718, 723 (Tex. App.—Fort Worth 2004, no pet.) ("A statutory probate court may exercise only that jurisdiction accorded it by statute."). Plaintiffs point to several Estates Code provisions that confer exclusive original jurisdiction on probate courts. For example, "[a]ll probate proceedings must be filed and

heard in a court exercising original probate jurisdiction," TEX. EST. CODE § 32.001(a), and "[i]n a county in which there is a statutory probate court, the statutory probate court has exclusive jurisdiction of all probate proceedings." *Id.* § 32.005(a). Plaintiffs assert that once a statutory probate court exercises original jurisdiction over a probate proceeding, that court maintains exclusive jurisdiction over any related causes of action.[5]

Yet the Estates Code also provides that a probate court has *concurrent* jurisdiction with the district court over certain enumerated claims, which include those for survival or wrongful death. *Id.* § 32.007 ("A statutory probate court has concurrent jurisdiction with the district court in: (1) a personal injury, survival, or wrongful death action . . . ."). Nothing in the text of this statute indicates that the Legislature intended to place statutory probate courts in a superior jurisdictional position to district courts and prevent an administrative body from exercising its own legislatively assigned exclusive jurisdiction over matters within its purview. *See Colorado County v. Staff*, 510 S.W.3d 435, 444 (Tex. 2017) (explaining that our goal in construing a statute is to give effect to the Legislature's intent, which we seek in the statutory text).

Because plaintiffs brought claims for survival and wrongful death, the probate court has concurrent but not exclusive jurisdiction over their claims. *See King v. Deutsche Bank Nat'l Tr. Co.*, 472 S.W.3d 848, 856 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (holding that section 32.005 "confers on statutory probate courts exclusive jurisdiction over causes of action related to a probate proceeding unless Section 32.007 provides that the action is subject to concurrent jurisdiction in a district court"). Probate court jurisdiction over plaintiffs' claims is no greater

---

[5] Plaintiffs cite multiple cases in support of this assertion, but none of these cases involved a cause of action enumerated in Probate Code section 32.007.

6

than district court jurisdiction would be. *See Shores*, 128 S.W.3d at 724 ("A statutory probate court's jurisdiction over actions involving trusts is concurrent with that of a district court. Thus, the district court's jurisdiction over actions involving trusts determines the extent of a statutory probate court's jurisdiction over such actions."). We therefore conclude that the Estates Code does not prevent the PUC from exercising exclusive jurisdiction to adjudicate any issues within its purview that arise in survival and wrongful-death actions brought in probate court.

## II. The PUC does not have exclusive jurisdiction to adjudicate common-law questions of reasonable care that underlie plaintiffs' claims.

### A. PURA defines the PUC's exclusive jurisdiction to regulate and to adjudicate.

We now turn to CenterPoint's arguments that plaintiffs' negligence suit raises particular issues that fall within the PUC's exclusive jurisdiction to adjudicate: specifically, the appropriate standard of care and whether CenterPoint complied with that standard. An agency has exclusive jurisdiction when statutory language "clearly expresses" that this is the Legislature's intent, or "when a pervasive regulatory scheme indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." *Chaparral Energy*, 546 S.W.3d at 138 (quoting *In re Sw. Bell Tel. Co.*, 235 S.W.3d at 624–25). We held in *Chaparral Energy* that PURA includes both express exclusivity language and a pervasive scheme. *Id.* at 139. Yet we also recognized that "[a]ll regulatory schemes have limitations," so we must determine whether issues underlying plaintiffs' claims "fall[] within [the PUC's] jurisdictional scope." *Id.* It is CenterPoint's burden to establish that the district court has been divested of subject-matter jurisdiction with respect to those underlying issues. *See In re Oncor Elec. Delivery Co.*, __ S.W.3d __, __ (Tex. June 25, 2021) (No. 19-0662).

7

In determining the PUC's jurisdictional scope, it is useful to keep some general principles of administrative law in mind. An administrative agency is "a legislative creation with only those powers expressly conferred and necessary to accomplish its duties." *Chaparral Energy*, 546 S.W.3d at 138 (quoting *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 216 (Tex. 2002)). The Legislature may grant an agency power to make rules as well as power to adjudicate disputes. As the Supreme Court of the United States has explained, agencies use rules to regulate future conduct and adjudications to determine past and present rights and liabilities. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 218–19 (1988). In other words, "adjudication deals with what the law was; rulemaking deals with what the law will be." *Id*. at 221 (Scalia, J., concurring). The governing statute may provide that an agency's jurisdiction to make rules has the same scope as its jurisdiction to adjudicate disputes, or those scopes may differ.[6] And an agency may be able to address certain issues only (or initially) through rulemaking while others require adjudication.[7]

Here, PURA defines the PUC's exclusive jurisdiction to regulate utilities as well as to adjudicate disputes involving utilities. Regarding regulation, PURA "establish[es] a

---

[6] For example, although the federal Equal Employment Opportunity Commission (EEOC) has jurisdiction to issue procedural regulations to carry out Title VII's anti-discrimination provisions, it cannot adjudicate claims based on those provisions. *Compare Edelman v. Lynchburg Coll.*, 535 U.S. 106, 109 (2002) (upholding EEOC regulation permitting person who timely files charge of discrimination to verify that charge thereafter), *with Fort Bend County v. Davis*, 139 S. Ct. 1843, 1846–47 (2019) (noting that the EEOC cannot adjudicate claims). In this way, the EEOC differs from agencies like the National Labor Relations Board (NLRB), which can both make rules and adjudicate claims. *See* 29 U.S.C. §§ 156, 160.

[7] *Compare N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 291–95 (1974) (holding NLRB had discretion to choose between rulemaking and adjudication to determine whether certain employees were managerial but recognizing that reliance on adjudication could be an abuse of discretion in other situations), *with F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012) (holding Federal Communications Commission violated television stations' right to due process by retroactively applying new definition of obscenity announced through adjudication).

8

comprehensive and adequate regulatory system for electric utilities to assure rates, operations, and services that are just and reasonable," TEX. UTIL. CODE § 31.001(a), and to that end gives the PUC "exclusive original jurisdiction over the rates, operations, and services of an electric utility" in certain geographic areas and exclusive appellate jurisdiction in others. *Id*. § 32.001(a), (b). PURA separately defines the PUC's powers of enforcement and adjudication, authorizing it to: impose an administrative penalty for violating statutes, rules, or orders (*id*. § 15.023(a)); issue a cease-and-desist order to a person engaging in certain hazardous or injurious conduct (*id*. § 15.104); and investigate and resolve a complaint by an "affected person" alleging "an act or omission by a public utility in violation or claimed violation" of a law, order, ordinance, or rule (*id*. § 15.051(a)).

CenterPoint argues that plaintiffs' claims turn on the allegation that CenterPoint failed to comply with PURA and the industry standards it incorporates when it selected fuses for its lines that were too large. According to CenterPoint, these allegations not only complain about CenterPoint's "operations" and "services" but also implicate safety, design, and reliability—all matters that the PUC has exclusive jurisdiction to regulate. Therefore, the PUC has exclusive jurisdiction over issues regarding the standard of care applicable to fuse size and whether CenterPoint complied with that standard, and plaintiffs are required to exhaust administrative remedies.

Plaintiffs respond that the trial court properly denied CenterPoint's plea to the jurisdiction because (1) under PURA, plaintiffs are not "affected persons" who may initiate complaints at the PUC, so it cannot adjudicate their claims; and (2) neither PURA nor PUC regulations address the matter of fuse size, any general PURA or industry standards that may inform CenterPoint's duty

9

are equivalent to common-law negligence standards, and the PUC does not adjudicate compliance with such standards. As in *Chaparral Energy*, we begin by examining PURA's express provisions regarding PUC jurisdiction and then consider the more general provisions of the regulatory scheme on which CenterPoint relies. *See* 546 S.W.3d at 138–39.

**B.      Because plaintiffs are not among those who may file a complaint in the PUC, it does not have exclusive jurisdiction to adjudicate any part of their claims.**

Plaintiffs contend their claims are outside the scope of the PUC's exclusive jurisdiction because they do not qualify under PURA to file a complaint with the agency because they are not "affected persons"; thus, there are no administrative remedies for them to exhaust. CenterPoint disagrees, asserting that PURA's text and purpose confirm plaintiffs qualify as parties required to seek relief from the PUC before proceeding in court. We conclude that plaintiffs are correct because none of the issues underlying their claims complain of a statutory or regulatory violation affecting their utility service or rates.

"A state agency has exclusive jurisdiction when the Legislature has granted it the sole authority to make an initial determination in a dispute." *Id.* at 138 (cleaned up). As noted above, we begin with the presumption that the trial court is authorized to resolve the parties' dispute, but that presumption may be overcome by "clear and express statutory language" giving an agency exclusive jurisdiction to adjudicate the matter. *Subaru of Am.*, 84 S.W.3d at 220. We therefore look to PURA to determine whether "the Legislature intended that the PUC determine this type of dispute." *In re Sw. Bell Tel. Co.*, 235 S.W.3d at 625.

In *Southwestern Bell*, we grounded our holding that the PUC had exclusive jurisdiction to adjudicate a customer's claims against a utility regarding a surcharge in statutes empowering the PUC to adopt review procedures, resolve billing disputes, and require refunds. *Id.* at 625–26.

10

Here, in contrast, no statutes give the PUC authority to adjudicate any part of the claims brought by plaintiffs.

As discussed above, PURA gives the PUC exclusive jurisdiction over "the rates, operations, and services of an electric utility." TEX. UTIL. CODE § 32.001(a). But as we recently explained, that provision addresses the PUC's jurisdiction to regulate these activities. *In re Oncor Elec. Delivery Co.*, __ S.W.3d at __. The Legislature has also defined the PUC's authority to adjudicate disputes by describing more specifically how a plaintiff's complaint must relate to the rates, operations, or services of a utility to trigger exclusive PUC jurisdiction to resolve that complaint. Under PURA, "an affected person" may file a complaint with the PUC "setting forth an act or omission by a public utility in violation or claimed violation of a law that the regulatory authority has jurisdiction to administer or of an order, ordinance, or rule of the regulatory authority." TEX. UTIL. CODE § 15.051. PURA defines an "affected person" as:

> (A) a public utility or electric cooperative affected by an action of a regulatory authority;
> (B) a person whose utility service or rates are affected by a proceeding before a regulatory authority; or
> (C) a person who:
>     (i) is a competitor of a public utility with respect to a service performed by the utility; or
>     (ii) wants to enter into competition with a public utility.

*Id.* § 11.003(1). Reading subsection (B) of the affected person definition (the only subsection potentially applicable here) together with section 15.051, the PUC has jurisdiction to adjudicate a person's complaint that a utility's act or omission violated either a law that the PUC has jurisdiction to administer or a regulatory order, ordinance, or rule if the alleged violation affected the person's utility service or rates. *See also In re Oncor Elec. Deliv. Co.*, __ S.W.3d at __ (explaining that scope of PUC's exclusive jurisdiction to regulate "the charging of rates and

11

provision of electricity" "equally informs [its] jurisdiction to adjudicate disputes between 'affected persons' and utilities"); *In re Tex.-N.M. Power Co.*, __ S.W.3d at __ (holding that plaintiff's complaints "are not about TNM's operations and services as a utility"); *Chaparral Energy*, 546 S.W.3d at 140 (concluding that customer's "complaints arise from [the utility's] alleged breach of" agreement to "provide electric service").

CenterPoint argues that under subsection (B), plaintiffs qualify as affected persons because they are persons whose "service" is affected by a proceeding they would initiate. It points us to the statutory definition of service: "any act performed and any facilities used . . . in the performance of the utility's duties under this title to . . . the public." TEX. UTIL. CODE § 11.003(19). Plaintiffs counter that they are not persons whose utility service would be affected by a PUC proceeding and their pleadings have never alleged otherwise.

In construing statutory language, "we presume the Legislature chose the statute's language with care, purposefully choosing each word, while purposefully omitting words not chosen." *In re Commitment of Bluitt*, 605 S.W.3d 199, 203 (Tex. 2020). And here, the Legislature chose the language "a person *whose* utility service or rates are affected" to describe who may file a complaint with the PUC. TEX. UTIL. CODE § 11.003(1)(B) (emphasis added). "Whose" is not defined in the Utilities Code, but when a term is not defined in a statute, we look to dictionary definitions for the term's common meaning. *City of Fort Worth v. Rylie*, 602 S.W.3d 459, 467 n.19 (Tex. 2020). The word "whose" indicates possession and is defined as "the possessive case of who." *Whose*, WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY (1996). It is a "relative pronoun to indicate possession." RONALD CARTER ET AL., ENGLISH GRAMMAR TODAY: AN A–Z OF SPOKEN AND WRITTEN GRAMMAR (2016).

Here, neither Higgins nor plaintiffs possessed any service from CenterPoint, and therefore they were not charged any rates.[8] We must give effect to all words of a statute and not treat any language as surplusage. *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000). Giving effect to the word "whose," plaintiffs are not "affected persons" under section 11.003 because they are not persons whose service or rates would be affected by a proceeding.[9] *See In re Oncor Elec. Delivery Co.*, __ S.W.3d at __ (concluding that plaintiff's suit "does not complain about [utility's] rates or his electrical service" or "allege damages arising from the provision of his electrical service"). Our dissenting colleagues view this result of applying the statutory text as "nonsensical," and they would ask whether the complaint involved "[a]n electric utility's service" rather than an affected person's service. *Post* at __.[10] But that is simply not what the statute says, and it is not our job to second-guess the wisdom of the language chosen by the Legislature.

CenterPoint asserts that any doubt about plaintiffs' ability to proceed before the PUC is dispelled by the definition of "complainant" in the PUC's procedural rules. Complainant is

---

[8] The parties disagree at length about whether the PUC's administrative complaint procedures are available to non-customers. Under section 17.157 of the Utilities Code, the PUC may resolve disputes between a "retail customer" and a utility, but neither party argues that section is applicable here. Aside from that section, the Legislature chose to define who may bring a complaint in the PUC as an "affected person," and we presume the Legislature chose this language with purpose. *See In re Commitment of Bluitt*, 605 S.W.3d at 203. We need only interpret the applicable statutory language and determine whether plaintiffs qualify as affected persons. Thus, contrary to the dissent's suggestion, we do not hold that affected persons are limited to a utility's customers.

[9] In contrast, the claim in *Chaparral Energy* arose from an existing agreement regarding electric service that was expressly governed by PURA. *See* 546 S.W.3d at 140. Thus, the claimant was an affected person under section 11.003(1) who could file a complaint with the PUC.

[10] We also note that the dissent's proposed expansion of part (B) of the "affected person" definition to include an electric utility's service would render other parts of the definition surplusage. Specifically, part (A) of the definition already includes "a public utility . . . affected by an action of a regulatory authority." TEX. UTIL. CODE § 11.003(1)(A). CenterPoint does not contend that the issues it asks the PUC to decide here are regulatory actions affecting it, and we decline to rewrite part (A) to eliminate that requirement.

defined as "[a] person, including commission staff or the Office of Public Utility Counsel, who files a complaint intended to initiate a proceeding with the commission regarding any act or omission by the commission or any person subject to the commission's jurisdiction." 16 TEX. ADMIN. CODE § 22.2(14). But those procedural rules also contain a definition of "affected person" that tracks section 11.003(1), *see id.* § 22.2(4), and they provide that the rules "shall not be construed so as to enlarge, diminish, modify, or otherwise alter the jurisdiction, powers, or authority of the commission." *Id.* § 22.1(b)(3). Exclusive jurisdiction to adjudicate a claim brought by plaintiffs must come from the Legislature, not the PUC's own procedural rules. *See Chaparral Energy*, 546 S.W.3d at 138 (noting that the PUC is a legislative creation and has only the powers "expressly conferred and necessary to accomplish its duties").[11]

Finally, CenterPoint asserts that plaintiffs would be accommodated as affected persons, citing three PUC proceedings that it claims entertained complaints from members of the general public.[12] We disagree with CenterPoint's characterization of these complaints. In each, the complainants owned land on which the PUC had granted utilities permission to install transmission lines. *See* TEX. UTIL. CODE § 37.051 (requiring an electric utility to obtain from the PUC a certificate of convenience and necessity before extending its service). The landowners alleged that the utility companies were not complying with prior PUC orders. No one asserted that the landowners did not qualify as affected persons, and the definition of service includes

---

[11] Recognizing the inability of the PUC's procedural rules to alter the statutory definition of "affected person" does not prevent PUC staff and the Office of Public Utility Counsel (OPUC) from initiating or intervening in a proceeding against a utility. The Utilities Code separately spells out the authority of PUC staff and OPUC. *See, e.g.*, TEX. UTIL. CODE §§ 13.003, 15.023, 15.104; *see also* note 15, *infra*.

[12] *See* Complaint of Dan Agan against Entergy Tex., Inc., Tex. Pub. Util. Comm'n Docket No. 46407; Complaint of Johnny H. against Oncor Elec. Delivery Co., Tex. Pub. Util. Comm'n Docket No. 40953; Complaint of Cecil R. Atkission against Lower Colo. River Auth. Transmission Servs. Corp., Tex. Pub. Util. Comm'n Docket No. 39516.

14

"facilities used or supplied by a public utility," which would include the equipment supplied by the utility. *See id.* § 11.003(10), (19).

In contrast, the PUC denied a landowner's motion to intervene in a City's application to amend a Certificate of Convenience and Necessity where the landowner did not meet the statutory definition of an "affected person" under the Water Code. Tex. Pub. Util. Comm'n, Order No. 6 Denying Interventions, *Application of City of Kenedy to Amend Water Cert.*, Docket No. 48622 (Mar. 1, 2019), 2019 WL 1100065. As CenterPoint notes, the PUC found that it did not have statutory authority to regulate the groundwater rights at issue, but it also denied the motion to intervene, citing the Water Code's definition of "affected person." *Id.* (citing TEX. WATER CODE § 13.002(1)). This authority confirms that the PUC requires a party to meet the statutory requirements to be considered an affected person.

For these reasons, plaintiffs' claims do not fall within the scope of PURA's express grant of exclusive jurisdiction to the PUC to adjudicate complaints. As an administrative agency, the PUC has no inherent authority and may exercise only those powers conferred upon it by the Legislature. *Pub. Util. Comm'n v. GTE–Sw., Inc.*, 901 S.W.2d 401, 406–07 (Tex. 1995). By defining who may file a complaint with the PUC, the Legislature indicated its intent to authorize the PUC to adjudicate complaints filed only by those parties. PURA does not expressly grant the PUC exclusive jurisdiction to adjudicate complaints by those who—like plaintiffs—are not affected persons.

**C. PURA's regulatory scheme has not displaced the common-law standards governing plaintiffs' claims, and the PUC does not adjudicate compliance with those standards.**

Absent an express grant of jurisdiction, "an agency may also have exclusive jurisdiction 'when a pervasive regulatory scheme indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed.'" *Chaparral Energy*, 546 S.W.3d at 138 (quoting *In re Sw. Bell Tel.*, 235 S.W.3d at 624–25). In *Southwestern Bell*, for example, we held that a claim regarding a telecommunication utility's excessive surcharges fell within the PUC's exclusive jurisdiction under PURA's pervasive regulatory scheme. 235 S.W.3d at 627. We recognized the PUC's exclusive jurisdiction over the claim because the Legislature directed it to adopt a "method for administrative review" as necessary to maintain the universal service fund as well as "rules for the administration of the universal fund." *Id*. at 625 (*quoting* TEX. UTIL. CODE § 56.023(a)(1), (d)). We also relied on the Legislature's authorization for the PUC to resolve disputes between a customer and a utility, TEX. UTIL. CODE § 17.157(a), enjoin a utility from engaging in acts that violate PURA, *id.* § 15.021, and assess administrative penalties for PURA violations, *id.* § 15.023. *In re Sw. Bell Tel.*, 235 S.W.3d at 626.

CenterPoint asserts that PURA's pervasive regulatory scheme also applies here, arguing that plaintiffs' complaints about its fuse-sizing practices and the design of its electrical distribution systems concern its operations and services, which section 32.001(a) of the Utilities Code grants the PUC exclusive jurisdiction to regulate. CenterPoint also contends that plaintiffs' claims raise a host of questions regarding safety, design, and reliability that fall within the PUC's exclusive regulatory jurisdiction. Plaintiffs respond that unlike in *Southwestern Bell*, there are

16

no provisions in PURA or any PUC regulations issued thereunder that specifically address the issue of fuse size, and they are not alleging any acts that violate specific PURA provisions. Instead, plaintiffs argue that industry standards of reasonable care govern the issues underlying their claims, and the PUC does not adjudicate compliance with such standards.

In evaluating these arguments, we begin with a detailed examination of plaintiffs' claims against CenterPoint. Those claims are rooted in common-law negligence; plaintiffs nonsuited allegations of negligence per se following a vigorous challenge by CenterPoint. Plaintiffs allege that CenterPoint has a duty to design, construct, operate, and maintain electricity distribution systems, facilities, and instrumentalities that are safe, adequate, efficient, and reasonable. This duty includes the responsibility to act and operate as a reasonably prudent electricity distribution company, comply with law and industry standards (including PURA and the National Electrical Safety Code), and use appropriate safeguards to protect those in proximity to ultrahazardous electrical currents. To comply with its duty, plaintiffs maintain that CenterPoint must design, construct, operate, and maintain its distribution system with a prudent and appropriate line protection scheme, including coordinated use of breakers and fuses to de-energize lines promptly when they experience faults.

Plaintiffs allege that CenterPoint breached this duty by failing to act as a reasonably prudent owner, operator, and handler of the power line, equipment, and electricity, and that its negligence proximately caused Higgins's death. Specifically, they allege that CenterPoint's line protection scheme was not properly designed or coordinated on the circuit where the incident occurred. Plaintiffs contend that had CenterPoint followed industry standards or even its own

17

internal standards regarding the type and size of fuse that protected the electrical line, the fuse would have de-energized the electrical line before Higgins encountered it.

CenterPoint focuses on the allegation that it breached its duty of reasonable care by using an improperly sized fuse, and it cites several statutes and regulations that it says bring the discrete issue of fuse size within the scope of PURA's pervasive regulatory scheme. In particular, CenterPoint contends that fuse size is part of CenterPoint's "services"—which include its "facilities used" and "act[s] performed"—as well as its "operations," all of which the PUC has exclusive jurisdiction to regulate. TEX. UTIL. CODE §§ 11.003(19), 32.001(a).

CenterPoint also points to statutes and regulations setting general standards that could be applied to the issue of fuse size. It cites Utilities Code section 38.001, which requires an electric utility to "furnish service, instrumentalities, and facilities that are safe, adequate, efficient, and reasonable," as well as the PUC's regulatory requirement that a utility "construct, install, operate, and maintain its . . . lines in accordance with" the standards of the National Electrical Safety Code. 16 TEX. ADMIN. CODE § 25.101(d). With respect to reliability, a PUC regulation requires utilities to "make all reasonable efforts to prevent interruptions of service." *Id.* § 25.52(b)(1).

We agree with CenterPoint that plaintiffs' claims are about CenterPoint's operations,[13] and that the issue of fuse size is one the PUC has exclusive jurisdiction to regulate under section 32.001. But as we explain below, the PUC has not exercised this jurisdiction: there is neither a law administered by the PUC nor a PUC order or rule that regulates fuse size prospectively, so

---

[13] As explained in Part II.B. above, however, plaintiffs' claims are not about services CenterPoint rendered to them. Thus, PURA does not expressly grant the PUC exclusive jurisdiction to adjudicate those claims.

there can be no complaint that CenterPoint violated any such standards in selecting the fuses at issue. *See* TEX. UTIL. CODE § 15.051(a). Setting standards for fuse selection retrospectively to resolve this dispute is not regulation, and adjudicating violations of laws that the PUC does not administer is also not regulation. *See Bowen*, 488 U.S. at 218–19; *In re Oncor Elec. Delivery Co.*, __ S.W.3d at __ (explaining that PUC's jurisdiction is "limit[ed] . . . to adjudications that implicate regulatory matters").[14] We conclude that the PUC is not empowered to resolve issues relating to fuse size here because (1) none of the statutes or PUC regulations cited by CenterPoint displace the common-law standard of care with respect to fuse size, and (2) whether that standard has been met in individual cases is not a "question[] of rules and regulations squarely within the PUC's purview." *Chaparral Energy*, 546 S.W.3d at 145. In short, PURA's pervasive regulatory scheme does not give the PUC exclusive jurisdiction because the parties' dispute does not involve a PUC regulatory action. *In re Oncor Elec. Delivery Co.*, __ S.W.3d at __ (concluding common-law claim did not involve "a regulatory action within the [PUC's] auspices").

Duties imposed by government regulation may in some cases supplant common-law duties as the standard for tort liability. *See* W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 36 (5th ed. 1984). But "[w]e have consistently declined to construe statutes to deprive citizens of common-law rights unless the Legislature clearly expressed that intent."

---

[14] Similarly, we agree with our dissenting colleagues that the PUC has exclusive original jurisdiction to regulate what the standard for selecting fuses "should be." *Post* at __. If the PUC does not like the common-law standard or is concerned that it will result in disparate treatment of utilities in similar situations that is not remediable through the appellate process, the PUC may adopt a different standard prospectively by regulation as necessary to assure adequate and efficient service. But the dissent does not acknowledge the distinction between regulation and adjudication, nor does it identify a source authorizing the PUC to adopt a new fuse standard retrospectively through adjudication or to determine whether CenterPoint complied with such a standard before it existed.

19

*Cash Am. Int'l, Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex. 2000) (applying this rule to reject exclusive agency jurisdiction); *see also Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 51 (Tex. 2015). And it is for a court—not the PUC—to decide whether the common law or statutes and regulatory actions provide the duty by which an electric utility's tort liability must be judged.

As CenterPoint correctly argued in resisting plaintiffs' claim of negligence per se in the trial court, PURA and PUC regulations do not clearly displace its common-law duty to operate as a reasonably prudent electricity distribution company. The statutes and regulations say nothing about fuse size; they require only that utilities act safely and reasonably.[15] Statutes and regulations generally requiring a party to act safely or reasonably do not substitute a legislatively imposed standard of conduct for the reasonable-person standard of common-law negligence. *E.g.*, *Entex, a Div. of Noram Energy Corp. v. Gonzalez*, 94 S.W.3d 1, 8–9 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (concluding statute requiring gas utility to furnish facilities that are "safe, adequate, efficient, and reasonable" did not impose different duty); *Ordonez v. M.W. McCurdy & Co.*, 984 S.W.2d 264, 271 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (holding that common-law negligence standard is read into statute imposing duty to act "safely").

CenterPoint's own evidence in the trial court confirms that industry practice—not a regulatory scheme—informs its duty with respect to fuse size. CenterPoint's expert testified in an affidavit that the National Electrical Safety Code "does not specify how utilities should design or operate their distribution system protection schemes," nor does it "direct an electric utility

---

[15] In contrast, the PUC has specifically regulated other interrupting devices. *See* Tex. Pub. Util. Comm'n, Order at 10, *Application of Magic Valley Elec. Coop.*, Docket No. 14652 (June 1, 1998), 1998 WL 35860710 (determining that "good utility practice calls for [particular] breaker relay settings").

20

how to select or size fuses . . . to protect the electrical distribution system." Rather, CenterPoint "has the right to determine its own system protection philosophy and how it selects its system protection devices." The expert also testified that "[w]hen and where to use fuses for laterals is up to the individual designer and there are no hard and fast rules," and that the "design, application and operation of CenterPoint's distribution line protection system complied with accepted good practice within the industry."

In sum, as CenterPoint put the matter in its motion for summary judgment, "the PURA provisions do not set out with sufficient clarity the 'standard of conduct' to which CenterPoint Energy would be held." Statutes and regulations that are consistent with common-law standards do not indicate that the Legislature intended to grant an administrative agency the exclusive means to remedy issues within their scope.[16]

The PUC also lacks exclusive jurisdiction to determine whether CenterPoint complied with the common-law standard of care in this case. By its own acknowledgment, the PUC lacks "the authority to make common-law determinations" or "adjudicate contract claims and torts," and instead "makes regulatory determinations regarding whether a utility violated PURA, Commission rules, and tariffs." Tex. Pub. Util. Comm'n, Order at 2, *Complaint of Giovanni Homes Corp. Against Oncor Elec. Delivery Co.*, Docket No. 45854 (July 18, 2019), 2019 WL 3642716; *see In re Oncor Elec. Delivery Co.*, __ S.W.3d at __. As the PUC sees the matter, its regulatory determinations "might inform a court on aspects of claims within the court's

---

[16] Of course, the PUC may exercise its supervisory power over CenterPoint's business by mounting its own inquiry into whether CenterPoint's fuse sizing is safe, reasonable, and compliant with national standards. *See, e.g.*, Tex. Util. Code §§ 14.001, 14.051, 38.001; 16 Tex. Admin. Code § 25.101(d). But PURA does not give the PUC exclusive jurisdiction to resolve disputes between a utility and a third party that are governed by the common law.

jurisdiction." Tex. Pub. Util. Comm'n, Order at 2, *Complaint of Giovanni Homes*, Docket No. 45854. But "[t]he Legislature has not conferred on the Commission any general authority to preside over tort actions." Tex. Pub. Util. Comm'n, Preliminary Order at 5, *Complaint of Sloss Against AEP Tex. Inc.*, Docket No. 50284 (Apr. 17, 2020), 2020 WL 1973315. In fact, "[t]he Commission has repeatedly stated that it does not have statutory authority to generally adjudicate contract claims and torts or award damages." Tex. Pub. Util. Comm'n, Amended Preliminary Order at 12, *Complaint of Vinson Against Oncor Elec. Delivery Co.*, Docket No. 40953 (May 21, 2013). Thus, the PUC found that a question regarding CenterPoint's negligence in another case was outside the scope of the proceeding because "[t]he Commission does not have jurisdiction to adjudicate private tort . . . disputes." Tex. Pub. Util. Comm'n, Preliminary Order at 3, *Complaint of Freedom Grp. LLC Against CenterPoint Energy Hous. Elec., LLC*, Docket No. 33052 (Dec. 15, 2006), 2006 WL 3716004.

We agree with the PUC. Nothing in PURA gives the PUC "jurisdiction to administer" the common law. TEX. UTIL. CODE § 16.051(a). In addition, as we explained in *Chaparral Energy*, the Texas Constitution protects the right to have a jury resolve fact questions in actions analogous to those tried by jury in 1876. 546 S.W.3d at 144 (citing TEX. CONST. art. I, § 15 & art. V, § 10). Courts are not free to outsource to the PUC the authority to adjudicate common-law questions and factual disputes properly decided by judges and juries. *See In re Oncor Elec. Delivery Co.*, __ S.W.3d at __.[17]

---

[17] Federal courts reach the same result under the so-called public rights doctrine. They recognize that although some issues can be determined by the executive and legislative branches, others are "inherently judicial." *N. Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 68 (1982) (plurality opinion of Brennan, J.). Public rights include matters that arise between the government and others in connection with the performance of the

Finally, CenterPoint argues that plaintiffs' claims implicate a standard of care set out in its tariff with the PUC. PURA requires that all utilities file a tariff with the PUC setting out the terms and conditions under which it provides electric utility service. TEX. UTIL. CODE § 32.101 (providing for the filing of a tariff that contains each rule "that relates to or affects" "a rate of a utility" or "a utility service, product, or commodity furnished by the electric utility"). One of the required provisions in a pro-forma tariff is that each utility will "construct, own, operate, and maintain its Delivery System in accordance with Good Utility Practice." 16 TEX. ADMIN. CODE § 25.214 (pro-forma tariff section 3.2).

CenterPoint asserts that the standards in the tariff generally inform its duties. We agree. *See First Assembly of God, Inc. v. Tex. Utils. Elec. Co.*, 52 S.W.3d 482, 492 (Tex. App.—Dallas 2001, no pet.) ("Texas courts examine the language of the tariff to determine if a duty exists."). But there are no requirements in CenterPoint's tariff that would apply to the issue of fuse size other than a general standard of care, which does not supplant the common-law standard as we have explained. We see no indication that the Legislature intended the PUC to resolve issues based on a tariff where no tariff provisions alter the applicable legal standards. *Cf. Chaparral Energy*, 546 S.W.3d at 142 (holding that the PUC had exclusive jurisdiction over a breach-of-contract case that could not "be resolved without considering and construing [the utility's] PUC-approved tariff"). In addition, any "defense that [a] tariff might limit [a utility's] liability does not create [PUC] jurisdiction." *In re Oncor Elec. Delivery Co.*, __ S.W.3d at __. We therefore

---

constitutional functions of the executive or legislative departments and can be adjudicated within those departments. *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018). On the other hand, a private right—such as the right to recover damages for a breach-of-contract claim—cannot be wrested away from the judicial power of Article III courts. *N. Pipeline*, 458 U.S. at 86–87.

23

hold that PURA's comprehensive regulatory scheme does not deprive the trial court of jurisdiction to adjudicate any issues raised by plaintiffs' suit.[18]

## CONCLUSION

For these reasons, neither PURA's express provisions nor the nature of its regulatory scheme demonstrates that the Legislature intended the PUC to have exclusive jurisdiction over any issues underlying this common-law negligence dispute. The trial court did not abuse its discretion by denying CenterPoint's plea to the jurisdiction, and we deny CenterPoint's petition for writ of mandamus.

_____
J. Brett Busby
Justice

**OPINION DELIVERED:** June 30, 2021

---

[18] The dissent misreads our opinion to say that the PUC has exclusive jurisdiction to adjudicate only matters that it has already decided, so there will never be anything for the PUC to adjudicate. *Post* at __. Instead, we hold simply that the PUC does not have exclusive jurisdiction to adjudicate what the standard of care is or whether a utility complied with that standard when no statute or PUC regulation displaces the common law on those matters. If the PUC had issued regulations setting its own fuse standards, there could still be disputes regarding what the standards required on particular facts or whether a utility complied with those requirements. We need not decide today the extent to which an affected person could be compelled to have the PUC adjudicate such disputed issues because there are no existing applicable fuse regulations and plaintiffs are not affected persons.